# COURT OF APPEALS
# DECISION
# DATED AND FILED

## October 13, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP1281-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2017CF157

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

RAYMOND M. GRATZ,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County:  JILL KAROFSKY and CHRIS TAYLOR, Judges. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. A jury found Raymond Gratz guilty of two counts of second degree sexual assault of a child under the age of 16, involving the same victim. The trial court made a series of rulings before and during trial, which are challenged by Gratz in the circuit court and now on appeal, allowing the State to introduce "other acts" evidence under WIS. STAT. § 904.04 (2019-20).[1] The other acts evidence consisted of search inquiries on the internet for incest-related content that were allegedly intentionally generated by Gratz on his personal computer. Gratz moved the postconviction court to vacate the judgment of conviction and to order a new trial on multiple grounds, including alleged ineffective assistance by trial counsel. After conducting an evidentiary hearing and considering the arguments of the parties, the postconviction court denied the motion. Gratz appeals. For the reasons explained below, we affirm.

## BACKGROUND

¶2 In a criminal complaint filed on January 19, 2017, the State alleged that on January 7, 2017, Gratz had sexual contact with A.B., who was then under the age of 16, in violation of WIS. STAT. § 948.02(2).[2] The complaint included the following factual allegations.

---

[1] After the case was reassigned from the originally assigned circuit court branch, the Hon. Jill Karofsky ("the trial court") presided over all pertinent pretrial and trial issues. The Hon. Chris Taylor ("the postconviction court") presided over all postconviction issues.

Separately, all references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] We identify the victim in this case by a set of initials different from her own in the interest of her privacy.

¶3 Gratz is A.B.'s father. During a forensic interview conducted at a child advocacy center, A.B. made statements that included the following. The two were watching television in their shared residence. Gratz put one hand underneath her shirt and bra and then ran a thumb across one of her breasts. Gratz said to her, "SHHH [it] is OK," then put one of his hands "down the back of," and underneath, her pants. She said "stop," and he pulled his hand out of her pants.

¶4 In the operative criminal information, the State charged Gratz with two violations of WIS. STAT. § 948.02(2) for the alleged touching of A.B.'s breast and buttocks.

¶5 Before trial, the State moved the trial court for an order permitting the State to introduce evidence of Gratz's "historical internet searches"—based on data extracted by law enforcement from Gratz's laptop and summarized in law enforcement reports—as other acts evidence under WIS. STAT. § 904.04. As summarized in detail in the Discussion section below, the State's other acts motion and related events provide the context for the primary disputes in this appeal.

¶6 During a two-day trial in April 2018, A.B. testified extensively about the alleged assaults and how she reported the incident to a school counselor and then others. Kyle Hill, a criminal analyst with the Division of Criminal Investigation in the state Department of Justice, testified about how he generated a report purportedly reflecting some content on Gratz's laptop computer, which constituted the other acts evidence admitted by the trial court. Gratz did not testify. The jury returned verdicts of guilty on both counts. The trial court sentenced Gratz in September 2018.

¶7 In August 2019, represented by new counsel, Gratz filed a post-conviction motion, containing multiple claims that largely track the issues now

raised on appeal. The postconviction court held an evidentiary hearing in January 2021 and issued a detailed written decision denying the postconviction motion in its entirety in April 2021. Gratz appeals.

## DISCUSSION

¶8 Gratz raises four sets of issues. The first three involve a shared topic: other acts evidence that the trial court permitted the State to introduce under WIS. STAT. § 904.04 consisting of historical internet data drawn from his laptop computer containing incest-related terms that the State alleged were intentional searches for such content by Gratz. Gratz argues that: (1) the trial court erroneously exercised its discretion in allowing the prosecution to offer the internet searches evidence; (2) the postconviction court erroneously exercised its discretion in determining that the prosecutor at trial did not commit prosecutorial misconduct by "sandbagging the defense" in connection with the internet searches evidence; and (3) the postconviction court erred in determining that the trial court did not violate Gratz's due process rights in ruling that the defense would "open the door" to additional internet searches evidence that the State would be allowed to offer if the defense attempted to argue to the jury that Gratz did not intentionally generate the internet searches at issue.

¶9 In the fourth set of issues, Gratz argues that the postconviction court should have determined that trial counsel was constitutionally ineffective in three respects (one involving the internet searches evidence), which we summarize in respective subsections below.

¶10 Given its central role in all four issues, we now summarize additional background regarding the internet searches evidence.

## I. ADDITIONAL BACKGROUND REGARDING INTERNET SEARCHES EVIDENCE

### A. Other Acts Motion And Defense Response

¶11    The State filed a pretrial motion in April 2017 for an order to "permit evidence of the defendant's historical internet searches," based on law enforcement searches of Gratz's "electronic devices."[3]  The State contended that this evidence would "prove [Gratz's] motive and intent to obtain sexual arousal and gratification from early teen girls," "rebut [Gratz's] statement that any inappropriate contact was accidental," and "corroborate the victim's credibility at trial."

¶12    The State relied on two exhibits in pursuing this motion when it was addressed by the trial court before trial:[4]

- "Parsed Search Queries."  This exhibit purported to list 53 occasions, with specified dates and times in 2013, and 2016, and 2017, on which a particular URL was allegedly used to search with a specified term or phrase, many of which appear related to incest or sexual activity involving under age persons.

---

[3] Gratz does not raise any Fourth Amendment issue in this appeal.  Evidence was presented at trial that Gratz provided written consent for police to seize a laptop computer, a smart phone, and a flip phone, all of which Gratz acknowledged owning, for the purpose of examining the devices to determine whether they contained child pornography.

[4] The prosecutor explicitly abandoned an initial attempt to offer a third exhibit, called "Pornography URLs," which purported to list 45 occasions on which Uniform Resource Locators (URLs) with incest-related terms were used in 2013, 2016, and 2017. (A URL, sometimes referred to as a web address, is a unique network designation used to locate a website on the World Wide Web.)  We observe that some text on the right-hand side of the electronic record item purporting to reflect "Pornography URLs" is obscured, to a greater or lesser degree, on each page, blocking out what one would normally assume to be complete date and time information.  But neither party raises any issue about this omitted information and we discuss it no further.

- "Internet Explorer 10-11 Main History" (hereinafter referred to as "Internet Explorer History"). This purported to list 28 occasions on specified dates and times in 2013, 2016, and 2017 when Gratz allegedly entered a URL that included the term "incest," some which included the phrase "father-daughter-incest."

¶13     Gratz objected that the internet searches evidence was inadmissible under the three-step analysis used to determine the admissibility of other acts evidence under *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), and its progeny.[5]  Gratz argued that the evidence had "little to no probative value," would be "of great prejudice to the Defendant," and would "create a sideshow" and confusion for the jury.  Gratz's confusion argument rested in part on the contention that the internet searches evidence was "unreliab[le]," in that it could suggest that Gratz performed searches that he could not in fact have performed. On this topic, Gratz contended that a close review of the evidence revealed that there were many "simultaneously" generated searches, which a single human user of the laptop could not have generated, and that at least some searches might have been the result of "malicious web-programming" or generated by other members of Gratz's household.

¶14     The trial court conducted an evidentiary hearing in September 2017.

## B. Pretrial Evidentiary Hearing

¶15     Kyle Hill testified in part as follows.  Hill is a digital forensics examiner.  His training has included the use of computer forensics programs that are designed to copy data stored on electronic devices, such as laptop computers,

---

[5] Gratz also initially objected to the timing of the State's motion and its production of discovery to date, but the trial court then postponed the trial date several times, apparently resolving that objection.  He does not raise this as an issue on appeal.

6

on a "bit-for-bit," "exact copy" basis. This involves the extraction of internet search queries and internet history terms. In the investigation of the allegations against Gratz, Hill created such an exact "forensic copy" from the hard drive of a laptop computer obtained from Gratz and then executed extractions. Hill testified that this process generated reports reflecting the data copied from the hard drive.

¶16    Hill testified to the following regarding the State's exhibit entitled "Parsed Search Queries." The Parsed Search Queries is a compilation of URLs reflecting "the probable search query" that was used. The result was "user-friendly" information, from which "the rest of the URL" was stripped away. This exhibit is an accurate, partial list of reports that Hill generated from the laptop data. Hill further testified that the search queries entered into the search engine Bing, as reflected in Parsed Search Queries, had been "user generated," as opposed to being generated by Bing as automatic searches or pop-ups, and as opposed to being ads generated from any source.

¶17    Hill testified to the following regarding the exhibit entitled "Internet Explorer History." Internet Explorer History is an exhibit that reflects websites that the laptop visited. It is an accurate, partial list of a report that Hill generated from the laptop data. The entries were "generated by some sort of user action versus automatically."

¶18    Hill testified that he had "a high degree of certainty" that he could differentiate between "user generated" versus "automatically generated" searches in the two exhibits. It was "unlikely" that the purported user entries reflected on Parsed Search Queries and Internet Explorer History were the results of "malware" (a malicious program designed to do harm to a computer or its user). This was because Hill's review of the files on the laptop did not reveal any file

"that seemed to be suspicious or indicative of a malware infection or anything that would cause the computer to be browsing pornographic sites." There might be malware of some kinds on the computer, but none that "would repeatedly browse the web."

¶19     The defense called no witnesses at the evidentiary hearing. In cross examining Hill, defense counsel questioned Hill's position that entries on the two exhibits were not likely produced by malware or automatically generated, either by the search engine Bing or by a visit to a website that did not itself involve searches for incest-related content.

¶20     At the close of the evidentiary hearing, the trial court rejected Gratz's position that there was not an adequate factual basis for admission of the internet search evidence. It ruled that the State had provided an adequate basis to offer the Parsed Search Queries as having allegedly been generated by Gratz and further ruled that this evidence was admissible under WIS. STAT. § 904.04 and *Sullivan*. As part of this ruling, however, the court directed that only those entries allegedly made on or after December 21, 2016—and therefore close in time to the alleged assaults—could be admitted. The court said that this evidence, as limited by the court's direction, was admissible for the jury to consider on the issue of whether Gratz touched A.B.'s breast or buttocks not "for the purposes of sexual gratification but just accidentally … for some other reason."

¶21     For reasons not evident from the record, the trial court did not address the admissibility of the Internet Explorer History exhibit, and neither side called the court's attention to this omission either during the hearing or at any time before trial.

## C. First Day Of Trial

¶22    After jury selection but before opening statements, the prosecutor emailed to defense counsel three Excel spreadsheets.  The nature of these files generally aligned with the nature of the three exhibits that the State had presented at the pretrial hearing, but with some differences.  Defense counsel expressed concern to the trial court, out of the presence of the jury, that it appeared that some of the data on these spreadsheets purported to reflect search entries made before the December 21, 2016 cut-off date established by the court's pretrial ruling.  Counsel also raised concern that "the formatting or expression" of the data in the spreadsheets did "not match the previous formatting or expression of them that we were provided in discovery."  In response, the prosecutor told the court that his understanding was that the only alterations from the information that the State had previously produced and addressed at the pretrial hearing was to change times that had been listed in the initial production according to the Universal Time Coordinate (the same as Greenwich Mean Time) to now show the equivalent time under Central Standard Time, a difference of six hours.

¶23    One of the three spreadsheets that the prosecutor emailed to defense counsel ended up becoming Trial Exhibit 6, which as discussed below the circuit court would eventually allow the prosecutor to offer as other acts evidence at trial. The content of Trial Exhibit 6 generally matched the content of the Parsed Search

Queries that was the focus of the trial court's pretrial ruling, as discussed above.[6] We will continue to refer to the pretrial exhibit as Parsed Search Queries and to the version offered at trial as Trial Exhibit 6.

¶24     Defense counsel said that he was not taking a position that *none* of the information contained on the three spreadsheets produced by the prosecutor on the first day of trial was admissible under the court's order; some might be admissible. However, counsel sought to limit the prosecution's opening statement on this topic until counsel could study the three spread sheets. The prosecutor agreed to limit his opening statement on this topic and defense counsel said that he had no objection to this.[7]

¶25     At the end of the first day of trial, out of the presence of the jury, defense counsel again generally questioned whether the three spreadsheets were

---

[6] Although counsel for both sides apparently failed to assist the trial court by making this clear when the issue first arose at trial, Gratz showed in the postconviction hearing that the number of entries reflected on the Internet Explorer History exhibit at the time of the pretrial hearing was smaller than the number of entries on the similar exhibit that the prosecutor provided to the defense on the first day of trial. But Gratz concedes on appeal that there were no material differences between the content of the eventually admitted Trial Exhibit 6 and the Parsed Search Queries exhibit that was discussed at the pretrial hearing, once one takes into account that Trial Exhibit 6 as admitted at trial did not include search entries purportedly made before December 21, 2016, pursuant to the trial court's pretrial order, as the court reaffirmed at the time of trial.

[7] In his opening statement the prosecutor told the jury in pertinent part that a report generated through data extraction from Gratz's laptop would show

> activity on the computer, Internet activity, where the person is looking for daddy daughter incest. And you are going to hear about that evidence to help you understand what the defendant's intent was when he touched his daughter's breast, when he touched her butt, to help you understand that this is not a mistake or an accident or something like that.

"fair game," but he did not object to a proposal by the circuit court that the court address the issue only after counsel submitted any objections in writing.

### D. Second (And Final) Day Of Trial

¶26 On the morning of the second day of trial, defense counsel filed a "Motion To Exclude State's Proffered Other Acts." It alleged the following. Taking into account the date limitation from the trial court's pretrial ruling, the 57 entries on the Parsed Search Queries exhibit that the State relied on at the pretrial hearing was reduced to 23 entries. However, the three exhibits that the State transmitted to the defense on the first day of trial consisted of: (1) 26 entries from Trial Exhibit 6, generally matching those contained in the Parsed Search Queries; (2) 108 entries from the Internet Explorer History exhibit, which the court had not ruled were admissible; and (3) 94 entries from the exhibit called "Pornography URLs," which the prosecutor had previously told the trial court the State would not be offering. *See supra* note 4. In addition, one or more of the newly produced exhibits (the defense motion is not clear on this point) contain "a new field with its own [time] calculations rather than the time stamp from the computer so that additional entries 'show' within the date range" allowed by the trial court, and "the Defendant's name [appears] next to every single entry," unlike with the previously produced exhibits.

¶27 The defense motion also alleged that this evidence was unreliable as proof of any intentional, relevant conduct by Gratz. The motion asserted that, if called, computer experts retained by the defense would testify that: (1) "only 5" of the "8 distinct 'searches'" that produced all of the 23 searches deemed admissible in the pretrial ruling "may have been typed at some point," while the others "were clicked"—presumably meaning, that the others had been generated

11

by the user clicking on a link, as opposed to by the user typing the queries; and (2) it was "exceedingly unlikely that these were 'searches of the defendant's own devising' and very likely that they were websites that were landed on due to often-deceptive ads from e-mails or dating [s]ites."

¶28    During discussion in the trial court at the start of the second day of trial, outside the presence of the jury, defense counsel represented that "our experts have been working tirelessly focusing on [the] 23 entries" that the court had ruled were admissible at the pretrial hearing.  Defense counsel argued that "the fact we get a list of over 200 of them after the trial starts[, which are not] compliant with the court's order, I think would justify exclusion of that evidence period," or that, in the alternative, the prosecution should be limited to offering the 23 entries.

¶29    The prosecutor confirmed that, as he had represented at the pretrial hearing, the State would not pursue its initial attempt to offer the "Pornography URLs."  The prosecutor acknowledged that the trial court at the pretrial hearing had not been "specific about what was happening with" the Internet Explorer History exhibit.  But he said that he interpreted the trial court to have allowed the entries from that exhibit purportedly entered on December 21, 2016, or later.  The prosecutor further argued that Trial Exhibit 6 (and the Parsed Search Queries) consisted merely of "data drawn from" the Internet Explorer History exhibit, and therefore not allowing the admission of the Internet Explorer History exhibit would "omit[] context."  The prosecutor asked the trial court to "clarify" its other acts orders.

¶30    The prosecutor also made the following "door opening" argument. If Gratz were to argue to the jury that the data on Trial Exhibit 6 "were not user

12

generated," but instead had been "automatically generated or [that] some kind of website oddity created these entries," the circuit court should deem the defense to have "opened the door" to the State's admission of the Internet Explorer History exhibit. This would be appropriate, the prosecutor argued, because the Internet Explorer History exhibit reflects "the actual data itself," which represents "a great deal of data that supports the [State's] expert's finding that the Parsed Search Queries," generally matching the content of Trial Exhibit 6, "are user generated."

¶31 The trial court asked defense counsel if the defense was objecting, in particular, to the URLs that were shown as parsed search inquiries in the "second column" of Trial Exhibit 6, which was the substantive evidence (*e.g.*, "amateur+teen+incest+with+daddy"). Counsel responded no.

¶32 The trial court affirmed its prior ruling allowing admission of the identified entries reflected on the Parsed Search Queries, now in the format of Trial Exhibit 6, but only those entries allegedly made after December 21, 2016. Although the trial court initially appeared to suggest that it would limit the State to use of the format of the Parsed Search Queries as it had appeared in the exhibit presented at the pretrial hearing, the court later said that it would "allow the state to introduce [Trial Exhibit 6] as an exhibit."

¶33 Addressing the "door opening" concept raised by the prosecutor, the court said:

> [I]f the defense is going to argue … that somehow these search queries [*i.e.*, the URLs on Trial Exhibit 6] were either produced automatically or produced by some other way other than [by] Mr. Gratz, I think [the defense will] open the door to the prosecution explaining [to the jury] how these queries were brought up on Mr. Gratz's computer.

> So if [the defense is] not going to go into that, then [the court would admit] just [Trial Exhibit 6 containing] the [limited] dates that I ordered in September. But if …[the] defense is that … these appear by some other way other than [Gratz] typing in something, then I do think [the defense has] opened the door and I will allow the [S]tate to introduce [evidence addressing] how [the prosecutor contends that] those queries got on his computer.

Defense counsel posed a confusing set of questions to the trial about this "door opening" concept.[8] The court responded that it would not address "hypotheticals" "on issues that aren't yet in evidence." The court repeated its position that, "[if] Mr. Gratz's defense is that these search queries ended up on his computer because something happened other than him typing in these words[,] the [S]tate is going to be allowed to rebut that." The clear implication of the court's statements was that it was reserving a decision as to the scope of rebuttal evidence that it would allow, waiting to see what relevant factors might exist at the time rebuttal was merited.

¶34     During the resumed trial, the State offered Trial Exhibit 6 during Hill's testimony and the trial court admitted it. This exhibit appears to reflect either 14 or 15 (depending on how entries are interpreted) entries with specific

---

[8] Defense counsel said:

> So what I wanted to clarify in terms of opening the door is that did—that may be opening up some other areas of this main history in terms of explaining these search terms, but yesterday when this was provided—the Internet Explorer main history—it was provided in the sense of 'here are independent, standing alone,' for instance, fatherrapesdaughter.com that did not appear in parsed search queries.

> And so I wanted to make sure that when we are talking about opening the door, we are talking about explaining the stuff in terms of what had been admitted. Does that make sense? Am I explaining it?

14

times and dates of either December 23, 2016, or January 4, 2017, which includes the data reflected on Parsed Search Queries.

¶35 Hill testified to the following on direct examination by the prosecution. Exhibit 6 reflected eight columns for each "artifact," *i.e.*, a datum generated by an alleged instance of historical internet use: (1) the specific type of artifact, which Hill described as reflecting occasions on which forensic software used by Hill "pull[ed] the information from" out of a larger report generated by the software (always "Internet Explorer 10-11" and either a "Main History," "Dependency Entries," or "Content"); (2) record number (unique identification of each artifact); (3) search term (*e.g.*, "amateur teen incest with daddy"); (4) URL (a string of symbols that includes search terms); (5) date/time; (6) search engine (always Bing); (7) artifact identifier number; and (8) source (a description of location within the computer at which the data was located).

¶36 Hill testified that one topic that was a "prevalent" topic for entries made on Gratz's laptop was what the prosecutor characterized as "daddy-daughter incest-related searches." Hill also testified that "[i]t appears" that the searches reflected on Trial Exhibit 6 "are most likely generated by some sort of user action." Hill clarified on cross examination that this meant "it wasn't something that was automatically done as a function of the Windows operating system," but, instead, the searches occurred when "the particular user on the computer interacted with [the computer] to obtain the result, most likely." Also on cross examination Hill testified that these could have been typed-in searches or instead the result of a user clicking on a link or an ad.

¶37 In his initial closing argument, the prosecutor addressed this issue as follows:

15

> So do we have any other evidence … of [sexual] gratification [purposes]? We do. We have the parsed search queries on [Gratz's] laptop. Kyle Hill from DCI talks about how [Hill] pulls … the data out, goes through the data, tries to f[i]nd stuff relevant to the case, and surprisingly he did. He did. He found daddy daughter incest search queries on the laptop—the laptop that only [Gratz] used. The laptop that [Gratz] had the password for. No one else used that laptop according to [A.B.].
>
> So that is important information, and … it helps us to understand what his intent was when he is touching [A.B.]. It shows [that the charged conduct] isn't mistake in tickling, this isn't a wrestling accident. His intent was gratification.

Defense counsel did not address the other acts topic generally, nor Trial Exhibit 6 specifically, in his closing argument. The prosecutor returned to these topics in his rebuttal closing:

> I will talk about lack of evidence. Is it reasonable to say that [A.B.] is just bothered? She is just generally bothered, something just bothered her. Wasn't sexually assaulted, something bothered her, and she ends up deciding in her head or perceiving wrongly that her dad sexually assaulted her, and then her poor dad—his computer somehow gets these parsed search queries of daddy-daughter incest all in a couple of weeks, and he isn't actually into his daughter that way and none of this is his fault. All of that again in a span of two weeks. It's not reality. It's not the real world. It's not reasonable and that's not real doubt.

### E. Postconviction Hearing

¶38 At the evidentiary hearing held by the postconviction court, defense counsel testified in pertinent part as follows. Defense counsel spent the entire evening and all night following adjournment of trial on the first day, until the trial resumed on the second day, on tasks that included the following: reviewing the three exhibits of internet search evidence that the prosecutor emailed to him on the first day of trial; reviewing the transcript of the trial court's prior ruling on other

acts evidence; and conferring with the experts on computer evidence that the defense had retained. He spent "several hours" comparing the exhibits that the prosecutor provided on the first day of trial with a large set of computer files that the State had produced early on in the case. Counsel did not sleep that night; by the time he delivered his closing argument on the second day of trial he had been awake for 34 to 40 hours. He prepared the written objections summarized above, which he filed electronically "shortly after 5:00 a.m."

¶39    Counsel testified that he did not prepare a closing argument before the start of the second day of trial because he thought that the trial would go into a third day, giving him the night of the second day of trial to compose it. Then, on the second day of trial, he "frantically tr[ied] to compose an outline for closing." It was only after he had finished giving his closing argument that he realized that he had failed to address the other acts evidence, an omission that he attributed to "disorientation."

¶40    Regarding the "door opening" issue, counsel testified that he understood the trial court to have ruled that if he "introduced evidence at all that [the internet search evidence was] not the result of [Gratz] typing it in, then it would throw open the door to [admission of] all of the evidence [that the court had] excluded." As a result, counsel testified, he "drastically curtailed my examination of the State's expert … Hill," and decided not to call the defense computer expert.

¶41    The postconviction court addressed some issues in oral rulings and followed that up with a detailed written opinion addressing the balance. In the oral rulings, the postconviction court determined that the trial court did not erroneously exercise its discretion in admitting Trial Exhibit 6 as other acts

17

evidence. The court also determined that Gratz failed to show prosecutorial misconduct in connection with the other acts evidence. Among the court's rationales was the fact that Trial Exhibit 6 "is substantially similar" to the Parsed Search Queries exhibit from the pretrial hearing and, further, that the defense had seven months to prepare any challenge to the substance of the only other acts evidence presented at trial. The court also observed that "there were so many ways" that trial counsel could have "handle[d] this that perhaps would not have necessitated this all-night marathon session" between the first and second day of trial. We address additional aspects of the written opinion as necessary to discussion below.

## II.    ADMISSION OF THE OTHER ACTS EVIDENCE

¶42    Gratz challenges the trial court's ruling allowing the admission of Trial Exhibit 6. We summarize applicable legal standards and then explain why we conclude that the trial court did not erroneously exercise its discretion in allowing the prosecution to offer this as other acts evidence.

### A. Legal Standards

¶43    In an unpublished but authored opinion, this court has summarized the applicable standards in the following terms:

> "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." WIS. STAT. § 904.04(2)(a). However, under some circumstances, "evidence of other crimes, wrongs, or acts" is admissible. To determine whether to admit evidence of other acts, courts engage in the three-step analysis set forth in [*Sullivan*, 216 Wis. 2d at 771-72, 783].
>
> The first step in the *Sullivan* analysis asks whether the party offers the evidence for a permissible purpose under WIS. STAT. § 904.04(2)(a). *Sullivan*, 216 Wis. 2d at

772. Permissible purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Sec. 904.04(2)(a). The second step in the *Sullivan* analysis asks whether the other-acts evidence is relevant. *Sullivan*, 216 Wis. 2d at 772. The party seeking the admission of the other-acts evidence (in this case, the State) has the burden to establish the first two steps of this analysis "by a preponderance of the evidence." *State v. Marinez*, 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399.

If the first two steps of the *Sullivan* analysis are satisfied, the burden then shifts to the opposing party … in the third step to "show that the probative value of the evidence is substantially outweighed by the risk" of confusion of the issues for the jury or unfair prejudice. *Id.*, ¶¶19, 41; *Sullivan*, 216 Wis. 2d at 772-73; *see* WIS. STAT. § 904.03.

In addition to "this general framework, there also exists in Wisconsin law the longstanding principle that in sexual assault cases, particularly cases that involve sexual assault of a child, courts permit a 'greater latitude of proof as to other like occurrences.'" *State v. Davidson*, 2000 WI 91, ¶36, 236 Wis. 2d 537, 613 N.W.2d 606 (quoted source omitted). This common law evidentiary rule is now partially codified in WIS. STAT. § 904.04(2)(b)1. *See State v. Dorsey*, 2018 WI 10, ¶¶31-33, 379 Wis. 2d 386, 906 N.W.2d 158. The greater latitude rule applies to each step of the *Sullivan* analysis. *Marinez*, 331 Wis. 2d 568, ¶20.

*State v. Coria-Granados*, No. 2019AP1989-CR, unpublished slip op. ¶¶11-14 (WI App Feb. 11, 2021) (alteration in original; footnote omitted).

¶44　Further pertinent here are the following principles, also summarized in *Coria-Granados*:

[A]s part of the relevancy analysis, there must be a determination that, pursuant WIS. STAT. § 901.04(2), there is sufficient evidence from which a jury could find by a preponderance of the evidence that the other acts happened. *State v. Gray*, 225 Wis. 2d 39, 59, 590 N.W.2d 918 (1999). "[I]mplicit in a decision that evidence of the other act is relevant is a determination that a jury could reasonably find by a preponderance of the evidence that the defendant committed the other act." *State v. Gribble*, 2001 WI App

19

> 227, ¶40, 248 Wis. 2d 409, 636 N.W.2d 488. The question is not whether the judge is convinced by a preponderance of the evidence that the other act happened, and the judge does not weigh the evidence. The question is whether a reasonable jury could find by a preponderance of the evidence that the act occurred. *State v. Ringer*, 2010 WI 69, ¶32, 326 Wis. 2d 351, 785 N.W.2d 448; *see, e.g.*, *Gray*, 225 Wis. 2d 39, 59-60. This is a question of law that this court reviews de novo. *Gribble*, 248 Wis. 2d 409, ¶40.

*Coria-Granados*, No. 2019AP1989-CR, ¶42.

### B. Analysis

¶45 Gratz acknowledges that, if the other *Sullivan* requirements are met, the internet searches evidence could be offered for the permissible purposes of showing lack of mistake or accident and to show an intent to act for the purpose of sexual gratification. He makes three arguments, which we identify and address in turn.

### 1. Sufficiency Of The Evidence

¶46 Gratz argues that the circuit court erred in determining that a jury could find by a preponderance of the evidence that he intentionally generated the queries for incest-related content—in other words, evidence that he typed the incest-related words into his laptop or intentionally clicked on a link that was recognizably incest-related. However, we agree with the State that the trial court could reasonably rely on Hill's unrebutted testimony at the pretrial evidentiary hearing that entries on Gratz's laptop appear to have been user generated.

¶47 Gratz acknowledges that Hill's testimony was generally relevant. He also does not dispute either that the prosecutor showed that Gratz owned the password-protected laptop at issue or that there was "user" data in evidence that was shared with the defense that showed Gratz to be the user of the laptop. His

argument is the following: "Hill's explanation of how tools helped him form his admittedly less-than-certain opinion that the entries were user-generated is insufficient to meet the preponderance of the evidence bar."

¶48    Starting with the "less-than-certain" reference, Gratz fails to provide a viable explanation for why we should conclude that the circuit court could not reasonably rely on Hill's testimony on this issue because it was less than certain. As his only support for the claim of insufficiency, Gratz cites to opinions offered by one of the defense computer experts, who was not called to testify at either the pretrial evidentiary hearing or at trial. The defense expert expressed these opinions at the postconviction evidentiary hearing. Gratz fails to explain how the trial court was supposed to have been aware of these opinions at the time it made the challenged rulings before and during trial to admit a well-defined subset of the other acts evidence that the State proposed to offer.

¶49    Gratz emphasizes the concept of "busy seconds," a phrase used to describe data reflecting multiple search entries occurring during the same second, which could suggest that some of the entries were not generated by a user. He points out that Trial Exhibit 6 purports to reflect multiple queries of the same terms being made at the same second. But at the pretrial evidentiary hearing, the prosecutor, defense counsel, and the trial court all posed questions to Hill related to the danger that the evidence the State sought to introduce included entries that were not generated by a user of the laptop. This included Hill's testimony that he made specific attempts in his reports to identify and eliminate entries that were "automatically generated," as opposed to user generated, and also that he "manually" reviewed the particular entries at issue. It also included testimony by Hill that a single search by a user could be reflected in a report as if it represented multiple results at the same time, depending on how the forensic software pulled

data from different locations on the computer. The circuit court could have reasonably relied on this testimony as establishing that a user's single intentional internet navigating act can generate multiple artifacts appearing on reports.

### 2. Relevancy

¶50 Gratz challenges the premise that, if he had intentionally typed in queries such as "daddy daughter incest" within days before the alleged assaults, this could reasonably support the inference that he intended to have sexual contact for purposes of gratification, that the touching was not an innocent mistake. But he fails to support a challenge to this premise. His current argument might have been a potential argument to the jury, but it has no merit as a relevancy argument.

¶51 The relevancy part of the *Sullivan* analysis turns in part on the "'similarity between the charged offense and the other act.'" *See State v. Hurley*, 2015 WI 35, ¶79, 361 Wis. 2d 529, 861 N.W.2d 174 (quoted source omitted). Similarity in this context "is demonstrated by showing the 'nearness of time, place, and circumstance' between the other-act and the charged crime." *Id.* (quoted source omitted). "The greater the similarity, complexity and distinctiveness of the events, the stronger is the case for admission of the other acts evidence." *Sullivan*, 216 Wis. 2d at 787. Gratz fails to show how these standards do not readily apply here on the relevancy issue to show motive and lack of mistake based on alleged multiple acts of seeking out incest-related content involving fathers and daughters in the days just before charged acts of incest on his own daughter.

¶52 Gratz emphasizes that the literal act of seeking out incest pornography on the internet is not the same thing as a literal act of incest. But it is not true, as Gratz argues, that evidence that a person sought out incest

22

pornography could not shed light on that person's intent and lack of mistake regarding an allegation of close-in-time incestuous conduct. Gratz argues that the act of searching for incest-related content on the internet is "completely legal," but the issue here is not whether the "other acts" alleged here were illegal acts. An alleged other act need not involve illegal or even wrongful conduct. *State v. Johnson*, 74 Wis. 2d 26, 41, 245 N.W.2d 687 (1976) ("It was evidence of prior 'acts' of the defendant, not necessarily wrongful and not necessarily criminal, which were relevant to the issue of willfulness."). Gratz asserts that "pornography use is widespread in the United States, including taboo pornography," and for support cites to an internet posting by "Pornhub" that was referenced in a circuit court filing by trial counsel opposing the other acts evidence, for what trial counsel characterized as purportedly commonly made, "arguably incestual," search terms. The circuit court was not obligated to credit this as support for a relevancy argument based on the specifics of this case.

¶53     Gratz also argues that the internet searches evidence was not relevant as other acts evidence because his credibility was not at issue in light of the fact that he elected not to testify at trial. This is beside the point. Whether he testified or not, the State could not prevail without proving beyond a reasonable doubt his intent and the lack of mistake. The other acts evidence was relevant to the jury's consideration of all the relevant evidence, including A.B.'s testimony that she experienced the touchings as sexual in nature.

### 3.  Probative Value Versus Substantial Prejudice

¶54     Gratz briefly argues that any probative value of this other acts evidence was "by far outweighed" by "the substantial prejudice associated with" such search terms as "amateur teen daddy don't fuck me" and "deep throat with

23

daddy." This argument is underdeveloped. In any case, we conclude that Gratz fails to show that he carried his burden on this *Sullivan* step, particularly in light of the "greater latitude" rule. *See Hurley*, 361 Wis. 2d 529, ¶59.

¶55 Gratz asks us to conclude that the internet searches evidence had "minimal probative value." But we conclude that this evidence could have reasonably provided strong proof of intent and lack of mistake, given the content of the alleged searches and how close in time they were to the alleged offenses.

¶56 Gratz suggests that the incestuous acts alleged in this case, if believed, while "repulsive," do not carry the same "shock value" as the internet searches evidence. There is no doubt some "shock value" in the internet searches evidence, as the trial court recognized in limiting the scope of the evidence allowed in the State's case-in-chief. But Gratz's argument is not persuasive that this evidence carries a "shock value" that likely overwhelmed the ability of the jury to fairly decide the issues in this incest case. This is so in part because the "greater latitude" rule applies here. Gratz's argument that this rule does not apply—because the internet searches evidence is not relevant to, because it is not "similar" to, the charged conduct—falls away because we have rejected his relevancy argument. That is, yet another shortcoming of Gratz's underdeveloped argument on the unfair prejudice issue is that it does not take into account the "greater latitude" rule based on the lack-of-relevancy argument that we reject.

## III.  ALLEGED PROSECUTOR MISCONDUCT REGARDING THE INTERNET SEARCHES EVIDENCE

¶57 Gratz's prosecutorial misconduct argument is based on the fact that, as summarized in detail above, the prosecutor sent an email to defense counsel on the first day of trial attaching three potential exhibits, the contents of which

generally matched, but in some respects differed from, the evidence submitted and approved for admission at the pretrial hearing. Gratz argues that the postconviction court should have determined that this conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *See* ***State v. Bell***, 2018 WI 28, ¶15, 380 Wis. 2d 616, 909 N.W.2d 750 (quoted source omitted). Gratz argues that this was misconduct and that it warrants reversal of his convictions. He argues that it was "sandbagging" that allegedly had the following effects: preventing defense counsel, on the night of the first day of trial, from sleeping or doing "any" "preparation" other than addressing the exhibits, "causing him to be sleep-deprived on" the second day, "to the point of inadvertently omitting a key argument entirely from his closing argument due to exhaustion." We provide pertinent legal standards and then explain why we reject Gratz's argument.

## A. Legal Standards

¶58 We now quote the standards for our review of the postconviction court's denial of Gratz's prosecutorial misconduct argument. As the following summary explains, his argument rests on a claim that his right to due process was violated.

> Our review of the trial court's decision to grant a new trial is deferential. The determination of whether prosecutorial misconduct occurred and whether such conduct requires a new trial is within the trial court's discretion. "An appellate court will sustain a discretionary act if the trial court examined the relevant facts, applied a proper standard of law, and used a rational process to reach a conclusion that a reasonable judge could reach."
>
> Prosecutorial misconduct "can rise to such a level that the defendant is denied his or her due process right to a fair trial." If the misconduct "poisons the entire atmosphere of the trial," it violates due process.… "When

25

> the seriousness of prosecutorial misconduct and the weakness of evidence of guilt cause us to question a trial's fairness, we will not hesitate to reverse the resulting conviction and order a new trial." Unless the government can demonstrate beyond a reasonable doubt that the error was harmless, reversal is warranted.

*State v. Lettice*, 205 Wis. 2d 347, 352, 556 N.W.2d 376 (Ct. App. 1996) (quoted sources omitted).

### B. Analysis

¶59    As context for the legal analysis that follows, we observe that we share the puzzlement expressed by the postconviction court about the apparent lack of productive communications before and during trial between counsel for the parties regarding the identification of other acts evidence. The postconviction court stated that it was "perplex[ed] that there was never a conversation between the attorneys about what was going on" regarding the details of the other acts evidence. That is, the record suggests unfortunate miscommunication and non-communication on both sides, but not "sandbagging." Notably, as summarized above, at the end of the first day of trial, defense counsel questioned whether the three spreadsheets provided by the prosecutor were "fair game," but he did not pursue these concerns immediately. Instead, he accepted a proposal by the circuit court that the court address the issue only after counsel submitted any objections in writing. Working on these written objections is (by trial counsel's own account) partly how he spent a sleepless night. It appears, at a minimum, that the prosecutor should have been more timely and precise in his communications

regarding other acts evidence and also that trial counsel was not sufficiently attentive to details or sufficiently prompt in articulating objections.[9]

¶60     Having made those contextual points, we now explain why Gratz fails to persuade us that the postconviction court did not adequately support a reasoned decision on the prosecutorial misconduct issue consistent with the pertinent legal standards.  Gratz does not show that the prosecutor's conduct "'poison[ed] the entire atmosphere of the trial.'"  *See Lettice*, 205 Wis. 2d at 252 (quoted source omitted).  More specifically, we reject Gratz's argument on the grounds that it depends on at least two related premises, each of which the postconviction court had a reasonable basis to reject.

¶61     The first inadequately supported premise is that the conduct of the prosecutor completely surprised trial counsel regarding the contents of the other acts evidence that the prosecution would offer at trial.  It is unclear from the record how the prosecutor described the three exhibits for trial counsel when he provided

---

[9] We are troubled in particular that, on the second day of trial, the prosecutor told the trial court that the exhibits he had presented to the court at the pretrial evidentiary hearing had been

> just generated … myself, and it was for a different purpose than trial.  It was just Other Acts to give the court a sense of what I was seeking to admit.  There isn't much data in the ones I submitted back at the Other Acts hearing.  [What the prosecutor was now offering has] a bit more data.  But we also have the full report from the analyst, which has all of the data in it.

The purpose of such a pretrial evidentiary hearing is *not* for the circuit court to merely get "a sense" of the evidence that a party seeks to offer.  It is for the court to rule on whether *specific* evidence is or is not admissible.  A great deal of confusion and effort by all concerned might have been avoided before, during, and following trial if the prosecutor had undertaken more diligently all of his responsibilities as the proponent of other acts evidence.  It was the prosecutor's responsibility to provide the court and opposing counsel with the precise exhibit that he planned to offer, pursuant to the court's pretrial order, in a timely manner.

them on the first day of trial. Assuming without deciding that the prosecutor failed to make clear what the exhibits consisted of and how he intended to use them, this would have been an inappropriate approach for the proponent of other acts evidence, because this could have carried some unfair element of surprise.

¶62 Having made that observation, it remains that the three exhibits resembled the exhibits that were the subject of the pretrial hearing. Further, as to the "Pornography URLs" exhibit, as far as the arguments of the parties and the record reveals, it appears that all trial counsel had to do on the first day of trial was to confirm with the prosecutor that he was not going to offer that as an exhibit (consistent with the prosecutor's withdrawal of it at the pretrial hearing), or, if the prosecutor was unclear or not communicative, take the issue up with the trial court. In a similar mode, trial counsel could have demanded an explanation as to the content of the "Internet Explorer History" exhibit on the first day of trial. As to Trial Exhibit 6, as the postconviction court noted, it contained essentially the same data as the Parsed Search Queries that the trial court addressed well in advance of trial. Consistent with that, as noted above, trial counsel responded "no" when the trial court specifically asked him whether he objected to the aspect of the exhibit that contained the allegedly probative search inquiries. Gratz fails to show that the prosecutor's conduct was such a complete surprise that it "'poison[ed] the entire atmosphere of the trial.'" *See Lettice*, 205 Wis. 2d at 252 (quoted source omitted).

¶63 The second related, inadequately supported premise is that the conduct of the prosecutor, whether intentionally or not, "forced" trial counsel to stay up all night in a fruitless struggle to understand and counter the other acts evidence, with the result that counsel poorly represented his client on the second day of trial. As the postconviction court also noted, it is far from clear that

anything the prosecutor did should have caused this. The defense had months to prepare based on disclosed evidence and trial counsel did not indicate to the circuit court on the first day of trial that he anticipated a need to spend the whole night trying to verify the consistency of the proposed trial exhibits with what was provided earlier. From all that we can see in the record and what Gratz argues on appeal, the prosecutor had no reason to suspect that his conduct would cause trial counsel to have the problems that he testified he had on the first night of trial, particularly since trial counsel agreed not to resolve the issues in court at the end of the first day of trial. To cite one illustrative example, trial counsel cannot reasonably blame the prosecutor for trial counsel's claimed failure to have accounted for the possibility that events might turn a possible three-day trial into a two-day trial, requiring him to prepare closing argument ideas before the end of the second day.

## IV.   "DOOR OPENING" ISSUE

¶64     Gratz argues that the postconviction court erred in determining that the circuit court did not violate his right to due process by ruling that, if he contested at trial that he generated the queries reflected on Trial Exhibit 6, the trial court would treat that as an "opening [of] the door" to additional evidence from the prosecutor to support the position that Gratz generated the queries. The trial court's ruling violated due process, Gratz's argument proceeds, because it prevented trial counsel from offering a defense in the form of evidence and corresponding argument to persuade the jury that Gratz did not generate the queries reflected on Exhibit 6.

### A. Legal Standards

¶65    The confrontation and compulsory process clauses of the Sixth Amendment to the U.S. Constitution and article I, section 7, of the Wisconsin Constitution guarantee the right to present a defense. *State v. Miller*, 2002 WI App 197, ¶45, 257 Wis. 2d 124, 650 N.W.2d 850.  While the states have broad latitude under the federal constitution to establish rules excluding evidence and the defendant's right to present evidence may be subjected to reasonable restrictions, in some circumstances an application of such rules may abridge the defendant's right to present a defense. *State v. St. George*, 2002 WI 50, ¶¶50-51, 252 Wis. 2d 499, 643 N.W.2d 777.  Evidentiary rules abridge this right when they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve'" by "infring[ing] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)).

¶66    Whether the postconviction court properly rejected this argument presents an issue of "constitutional fact" that we determine without deference to its determination. *See St. George*, 252 Wis. 2d 499, ¶16.

### B. Analysis

¶67    Gratz fails to support an argument that the trial court improperly exercised its discretion in any way in making its door opening ruling, much less does he support an argument that the trial court's ruling was "arbitrary" or "disproportionate to the purposes" of the evidence rules such that it infringed on a "weighty interest" of Gratz's.

¶68    As summarized above, the trial court was careful not to address "hypotheticals."  Instead, the court made the following clear, but limited, ruling:

if the defense attempted to suggest to the jury that the queries were created "by some other way…than [Gratz] typing" on his laptop, then the court predicted that it would "allow the state to introduce [evidence addressing] how [the state contends that] those queries got on his computer." This did not prevent the defense from presenting expert opinion or evidence that Gratz did not intentionally create the queries. It also did not define the scope of additional evidence that the prosecutor would be allowed to offer, beyond Trial Exhibit 6, which might well have been limited to the specific evidence that the parties and the court discussed at the pretrial hearing and on the first day of trial. Further, Gratz does not suggest that the circuit court indicated that the defense would not have a reasonable opportunity to contest the scope of any rebuttal evidence actually proposed by the prosecutor. As summarized above, the prosecutor's specific request in making the door opening argument was that, if the door was opened, the prosecution should be allowed to offer the Internet Explorer History exhibit. This was data that the defense had access to well in advance of trial.

¶69 In making this clear, limited ruling, the trial court could rely on settled law that "the standard for rebuttal evidence is quite broad: any evidence otherwise admissible that 'in any respect tends to contradict the witness, is admissible' for rebuttal." *See State v. Novy*, 2013 WI 23, ¶44, 346 Wis. 2d 289, 827 N.W.2d 610 (quoting *State v. Watson*, 46 Wis. 2d 492, 500, 175 N.W.2d 244 (1970)). The circuit court may allow the State to offer rebuttal evidence that the court deems "necessary and appropriate" in response to defense evidence or argument. *Novy*, 346 Wis. 2d 289, ¶34.

¶70 Gratz's implied argument seems to be the following: If the trial court was ever going to rule that the State might be or would be entitled to offer rebuttal evidence on this topic, it was obligated to do so at the time of the pretrial

31

hearing on the "other acts" topic. But he fails to provide any support for this view. Further, case law such as *Novy* directly undermines it.

¶71    Gratz relies on a federal district court opinion as persuasive authority that is completely distinguishable. *See Pulinario v. Goord*, 291 F. Supp. 2d 154, 156 (E.D.N.Y. 2003) ("fair" homicide trial "impossible" after district court "allow[ed] the defense to rely on an earlier ruling" by the court that a well-founded defense of post-traumatic stress disorder and rape trauma syndrome would be permitted, but then "mid-trial," the court "cut the legs off the defense's theory after petitioner had been committed to it irretrievably"). Gratz fails to identify any statement or suggestion by the trial court at the time of the pretrial hearing suggesting that the State might not, or would not, be entitled to present rebuttal evidence, regardless of how events unfolded at trial.

¶72    Gratz argues that the circuit court's ruling "forced" trial counsel to abandon the defense, but this is not accurate. The court did not prevent this defense. It merely predicted that it would allow the prosecutor to make a rebuttal challenge, which the prosecutor proposed to make using additional evidence that had long been in the hands of the defense. This was a decision regarding the potential for rebuttal evidence that the trial court was free to make at any time. The issue is not whether the trial court "had ample opportunity to make this ruling prior to trial," as Gratz now contends, but whether the court could properly exercise its discretion to make the ruling it made when it made it. Further, the postconviction court made a finding, which Gratz does not show is clearly erroneous, that trial counsel "made a reasonable, strategic decision to forgo challenging the State's theory on the origin[s] of the parsed search terms and not risk opening the door to additional evidence of user-generated, incest-related computer searches."

## V.    INEFFECTIVE ASSISTANCE CLAIMS

¶73    Gratz argues that trial counsel was constitutionally ineffective by: (1) failing "to rebut" the other acts evidence through argument to the jury; (2) failing to object to testimony by three witnesses (a school counselor, a deputy, and detective) that A.B. made statements to these witnesses that were consistent with her incriminating testimony about the alleged assaults; and (3) failing to object to testimony by the school counselor that "[t]here was never any time that [A.B.] told me anything that I thought she was not being honest or forthright."

¶74    The State does not argue that, in any of the three instances, trial counsel's performance was not deficient.  Instead, it argues that none of the alleged deficiencies prejudiced Gratz either individually or through a collective effect.  We reject each of Gratz's ineffective assistance arguments.

### A.  Legal Standards

¶75    To demonstrate ineffective assistance of counsel that violates the Sixth Amendment, a "defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To show deficiency, a defendant must demonstrate that counsel's performance fell below "'an objective standard of reasonableness.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (quoting *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305).  To show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶76    Prejudice is evaluated in the context of the overall defense strategy and all of the evidence at trial. *See **State v. Maday***, 2017 WI 28, ¶58, 374 Wis. 2d 164, 892 N.W.2d 611 ("When determining if counsel's deficiency undermines confidence in the outcome of the trial and amounts to prejudice, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" (quoting ***Strickland***, 466 U.S. at 695)); ***State v. Jenkins***, 2014 WI 59, ¶50, 355 Wis. 2d 180, 848 N.W.2d 786 ("Our prejudice analysis is necessarily fact-dependent.   Whether counsel's deficient performance satisfies the prejudice prong of ***Strickland*** depends upon the totality of the circumstances at trial.").

¶77    A claim of ineffective assistance of counsel presents a mixed question of law and fact, under which we uphold the circuit court's findings of fact unless they are clearly erroneous but we review de novo whether counsel's performance was constitutionally ineffective. ***Thiel***, 264 Wis. 2d 571, ¶21.

## B. Failure Of Trial Counsel To Provide The Jury, In Argument, With Reasons To Question The Internet Searches Evidence

¶78    Assuming without deciding that trial counsel was deficient in failing to present arguments to the jury "rebutting" the other acts evidence, we conclude that Gratz fails to persuade us that this was prejudicial, given the weak nature of any potential arguments.   Due to trial counsel's strategic decision not to offer evidence on this topic, including expert testimony, any argument questioning the substance of Hill's testimony would have had limited value.

¶79    Gratz briefly suggests two omitted argument topics, which we conclude do not show prejudice.

¶80    First, Gratz asserts that trial counsel should have highlighted for the jury aspects of Hill's trial testimony that Gratz argues might have planted doubt in

the minds of jurors about whether Gratz intentionally generated the queries. But as support for this concept, Gratz cites little of substance that could have supported a jury argument. Gratz now points out that Hill testified on cross examination that the search queries were "most likely" user generated, but also testified, without elaboration, that they "could be" generated by, in the words of trial counsel, "a link or ad that someone clicked." Hill also testified that, while internet advertising generally does not contain spelling errors and some of the queries here contained spelling errors, "it's possible" that some advertisers intentionally use spelling errors to generate traffic, "but … I can't personally speak to" the topic. Similarly, Hill testified:

> It's impossible to say whether anything is absolutely positively generated by the user on the computer. Many times that's the most likely explanation, but it's impossible to rule out something else because we can't place somebody in front of the keyboard on the computer, just based on … the evidence we see on the computer.
>
> So there's always … the possibility of something else happening. But the most likely explanation is these are on the computer.

Trial counsel's failure to remind the jury of these "anything is possible" qualifications could not have been significant.

¶81 The second argument also lacks substance. Gratz contends that trial counsel could have argued that, even if Gratz did intentionally generate the queries for incest-related content close in time to the alleged assaults, this would not "make it more likely that [he] would commit comparable acts, just like anyone watching television or movies wouldn't act out what they watched." This resembles Gratz's argument, addressed above, that the other acts evidence was not relevant because, he asserts, "pornography use is widespread in the United States,

including taboo pornography." Repurposed to this context, the argument carries no more weight. It is sufficient to point out that an argument by trial counsel to the jury along these lines would not have been based on any evidence about the actual correlation or lack of actual correlation between persons who seek out incest-related content and those same persons attempting to commit or actually committing acts of incest—there is no such evidence in the record. This would have been merely a highly speculative statement of a lawyer, to which jurors would not be permitted to assign any weight. *See* WIS JI—CRIMINAL 157 ("Remarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion."). Gratz fails to demonstrate that a mere assertion by trial counsel to this effect would have mattered in the context of the trial as a whole and therefore fails to establish any prejudice.[10]

---

[10] To the extent that this argument is based on the concern that the jury would rely on the other acts evidence to find that Gratz has "bad character," this concern is mitigated by the fact that the circuit court instructed the jury as follows:

> Evidence has been presented regarding other conduct of the defendant for which the defendant is not on trial. Specifically, evidence has been presented about the defendant's searches of his laptop. If you find that this conduct did occur, you should consider it only on the issues of intent and absence of mistake or accident. You may not consider this evidence to conclude that the defendant has a certain character or certain character trait, and that the defendant acted in conformity with that trait or character with respect to the offense charged in this case.
>
> The evidence was received on the issues of intent; that is, whether the defendant acted with the state of mind that is required for the offense charged, absent of mistake or accident. That is, whether the defendant acted with a state of mind required for the offense charged. You may consider this evidence only for the purposes I have described, giving it the weight you determine it deserves. It is not to be used to conclude that the defendant is a bad person and for that reason is guilty of the offense charged.

¶82    These were not "key" arguments for the defense, as Gratz now argues.  They would have been of marginal value to the defense at best.

### C. Failure Of Trial Counsel To Object To Testimony Regarding Out-Of-Court Statements By A.B.

¶83    Gratz asserts that trial counsel was constitutionally ineffective in failing to object to testimony by three witnesses that A.B. made statements to these witnesses that were consistent with her testimony at trial incriminating Gratz.  We conclude that Gratz fails to develop a coherent, supported argument disputing the view of the postconviction court, which is developed as an argument by the State on appeal.   The State's argument is that Gratz cannot establish prejudice because, even if there had been a defense objection, these statements were likely admissible under the residual hearsay exception, WIS. STAT. § 908.03(24), as discussed in authority that includes *State v. Sorenson*, 143 Wis. 2d 226, 242-51, 421 N.W.2d 77 (1988) (statements of children who are the alleged victims of sexual assaults may be admissible under the residual hearsay exception based on a five-factor test).  *See also State v. Stevens*, 171 Wis. 2d 106, 120-21, 490 N.W.2d 753 (Ct. App. 1992) (explaining that such statements, if reliable, can fall into "an unanticipated category of hearsay" that is admissible under the residual hearsay exception).

¶84    In his opening brief, Gratz merely asserts the following on this topic:

> The defense … believes that [the residual hearsay] exception would not apply to the statements of this thirteen-year-old child based on *State v. Gerald L.C.*, 194 Wis. 2d 548, 556-557, 535 N.W.2d 777 ([Ct. App.] 1995).  Regardless, that analysis pertains to admissibility, not prejudice.  The court provided no basis for why, if erroneously admitted, that testimony was non-prejudicial.

We make the following observations. First, this statement of "belief" contains no analysis of either the discussion contained in *Sorenson* or that in *Gerald L.C.* as those cases could apply here. Second, this contains an incorrect pinpoint citation to *Gerald L.C.* In the section of *Gerald L.C.* that Gratz apparently intends to cite, this court concluded that a circuit court erroneously exercised its discretion in admitting the statement of a fourteen-year-old to a sheriff's deputy, two weeks after the alleged incident, under the residual hearsay exception. *Gerald L.C.*, 194 Wis. 2d at 553, 559-64.

¶85 In its brief, the State provides reasons to conclude that, in response to defense objections, the trial court here would likely have applied the test set forth in *Sorenson* to determine that the statements were admissible, and therefore it could not have prejudiced Gratz that trial counsel did not make objections. As the State notes, this position is equivalent to the position that trial counsel was not deficient for failing to pursue an objection that would have been overruled. But the State elects to frame this as a "no prejudice" argument, as opposed to a "no deficiency" argument, apparently out of deference to a finding of the postconviction court that trial counsel in fact performed deficiently because he did not understand pertinent rules of evidence.

¶86 In replying on this topic, Gratz states only the following:

> As Gratz noted in his [opening] brief, the dubious proposition that the residual hearsay exception would apply goes to deficient performance (i.e. an objection would have been overruled, so counsel could not be deficient), not to prejudice—and the State does not contest whether counsel performed deficiently. [A.B.]'s credibility was paramount to the State's case, and counsel's failure to object to the testimony bolstering this credibility by repeating her claims was substantially prejudicial to Gratz.

¶87 Gratz's position on this topic is confusing. As best we can discern, without developing an argument based on any statements contained in *Sorenson*, or in the only authority that Gratz cites, *Gerald L.C.*, Gratz's position is that the State concedes that trial counsel performed deficiently in failing to make objections, which Gratz submits necessarily implies the concession that the statements could not be admitted under the *Sorenson* analysis. We disagree that the State's briefing can reasonably be interpreted to include a concession that these statements were not admissible. In sum, Gratz fails to develop a coherent, supported argument on this issue, and as a result he fails to show how he has carried his burden of establishing prejudice on this issue.

### D. Failure Of Trial Counsel To Object To Opinion Evidence Regarding A.B.'s Honesty

¶88 Gratz argues that trial counsel was constitutionally ineffective in failing to object to testimony that the school counselor gave regarding A.B.'s "character for truthfulness" during redirect examination by the prosecutor. The following is the exchange at issue:

> Q.     And from your interactions with [A.B.] over those three years—sixth, seventh, eighth grade—were you able to form an opinion as to her character of her truthfulness?
>
> A.     I always found her … to be honest. There was never any time that she told me anything that I thought she was not being honest or forthright. I never heard any comments from any teachers that they felt that she wasn't being honest.

The State does not dispute Gratz's point that, because the defense did not challenge A.B.'s character for truthfulness, WIS. STAT. § 906.08(1)(b) could not render this an admissible opinion regarding the character for truthfulness of a witness. Nor does the State dispute his further point that a response to a question

regarding an opinion on this topic "may refer only to character for truthfulness or untruthfulness." *See* § 906.08(1)(a). The State's argument is limited to the position that Gratz fails to show prejudice.

¶89 Unlike with the two other ineffective assistance claims addressed above, we conclude that Gratz shows the potential for prejudice that could have been created by failure to object to this testimony. As Gratz points out, even if her honesty was not directly attacked by the defense, A.B.'s credibility was central to the case. In closing argument, trial counsel argued that her "recollection of things is quite inconsistent in a number of regards," which he argued should cause jurors "to question the consistency or accuracy" of her "perceptions."

¶90 However, assuming without deciding that it was deficient performance for trial counsel not to object to this testimony, we conclude based on the following factors that Gratz has not shown prejudice that merits reversal.

¶91 First, as the postconviction court noted, the facts here differ significantly from such precedent as *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984), in which this court stated that "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Id.* at 96. As here, *Haseltine* involved an incest prosecution. But at issue there was the following testimony by a psychiatrist: that he had performed a professional examination of the alleged victim; that he could identify patterns of behavior exhibited by incest victims generally; and that he had "no doubt whatsoever" that the alleged victim in that case testified truthfully that she had been sexually assaulted. *Id.* at 95-96. In contrast here, the school counselor did not present herself as an expert and her comments were considerably more generic.

40

¶92 Second, here the counselor's testimony was brief altogether, the portion at issue passed quickly, and it was not referenced in the prosecutor's closing argument. Considered as part of the totality of the circumstances, notably including A.B.'s extensive testimony that gave the jury extended opportunities to assess her credibility, this isolated testimony during the brief testimony of the counselor should not have had a meaningful effect on the jury's decisions.

## V. Cumulative Effects

¶93 Gratz argues that a new trial is required due to the cumulative effects of "the erroneous admission of the pornography search evidence and counsel's failure to rebut that in closing arguments," together with trial counsel's failures to object to the testimony from the three witnesses regarding prior consistent statements by A.B. and the "character for truthfulness" testimony by the counselor. However, we have explained why we conclude that there was no error in the admission of the other acts evidence. We have also explained our conclusion that the only potential prejudice that Gratz purports to identify in a developed argument—that which could have arisen from the "character for truthfulness" testimony—was not sufficient to meet the legal standard for reversal when considered in the context of the trial as a whole.

## CONCLUSION

¶94 For all of these reasons, we affirm the postconviction court's denial of the postconviction motion in its entirety and affirm the judgment of conviction.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

41